**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 4, 2013

No. 12-20094

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff–Appellee

v.

ROSE B. ESSIEN,

Defendant–Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:09-cr-225-2

Before DeMOSS, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Rose Essien appeals her conviction for healthcare fraud and identity theft. Specifically, she claims first that there was insufficient evidence at trial to convict her, and second, that she should not be responsible for the entire restitution amount because the jury acquitted her on three counts of the fourteen brought against her. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-20094

Medicaid covers the cost of providing beneficiaries medically-necessary durable equipment, including diapers and incontinence supplies. If a company meets Medicaid's conditions, it can apply to become an approved Medicaid provider of equipment. One required condition for becoming an approved provider is certifying that all information submitted will be true and accurate. Once a company is approved, providers can directly provide patients with equipment and bill the cost to Medicaid. The Essien family[1] founded and ran a series of healthcare related companies that purported to buy and deliver medical supplies to patients in exchange for compensation from either Medicare or Medicaid.[2]

*1. The First Company: Logic World Medical*

Benjamin Essien started a health care business in Houston, Texas called Logic World Medical ("Logic World") around 2003. Logic World, a licensed provider of durable medical equipment ("DME") under Medicare, supplied a variety of DME, such as lifts, wheelchairs, and beds. Presumably due to a series of crack-downs on companies fraudulently billing Medicare for power wheelchairs, Logic World shifted its focus to incontinence supplies—such as diapers—that Medicaid, but not Medicare, would cover. Another possible reason for Logic World's changed business strategy may have been that supplying diapers provided a thirty-percent profit margin. In September 2003, Logic World became an approved Medicaid provider.

Because Medicaid covers only the cost of medically-necessary equipment, a doctor must first fill out a "Title 19" form, which serves as a prescription

---

[1] Throughout this opinion, the court uses first names to identify members of the Essien family (brother Benjamin, sister Rose, and father Bassey) because all share the same surname.

[2] Medicare is a health insurance program for people ages sixty-five and older or those with disabilities and is administered by the federal government. Medicaid helps pay certain health care costs for low-income persons and is administered by the state governments.

verifying the patient's need for the equipment. The Title 19 form must include the equipment provider's name and Texas Provider Identifier number, as well as the printed name of the doctor's representative certifying that the services being supplied are consistent with the physician's directive. Then, after the equipment is delivered to the patient, the provider (here, Logic World) bills Medicaid through either billing software or Medicaid's own website.

Benjamin hired Andatrica Howard ("Howard") to handle his billings. Howard secured the Title 19 forms for Logic World, and then billed Medicaid based on the information in those forms. Initially, Benjamin compensated Howard for managing Logic World's Medicaid billing with a four percent commission. After Howard threatened to send business to Logic World's competitors if her compensation was not increased, Benjamin increased her commission to twelve percent of Logic World's gross income. Howard, not satisfied for long, ended her relationship with Logic World in 2005.

In 2004, before Howard stopped billing for Logic World, the Essien family decided that Benjamin's sister, Rose, and father, Bassey, would assist with Logic World, enabling Benjamin to go to school. Bassey began writing checks on Logic World's business account, and Rose became Logic World's office administrator. By virtue of her position, Rose became intimately involved in the business operations of the company.

Rose maintained Logic World's office, sent and received faxes, did clerical work, and "update[d] patient records based on information from the field, calls made into the office, and the like." Rose also began calling Medicaid's support hotline on Logic World's behalf. From October 26, 2004 to January 2, 2006, Rose called Texas Medicaid at least forty-nine times. Eventually, she was listed as Logic World's contact person on invoices. Rose also printed delivery tickets and was "supposed to adjust [the] patient roster and take people off that shouldn't be there or add . . . the new name if somebody was found."

Benjamin reported that Rose "had a lot to do with the billing process" at Logic World, but also stated that he was the one who sent the final information to Medicaid. After Howard stopped managing Logic World's billing, "not only was [Rose] analyzing what's coming from the field, but now when things came from the doctor into [the] fax machine, she would analyze it through the [Texas Medicaid] Web site for [Benjamin], update the list, do the deliveries." Further, because they all came through Rose, "she saw the delivery tickets that showed 300 extra-large diapers time after time after time," including multiple delivery tickets without dates.

Moreover, on Rose's application to pharmacy school, she stated that she began billing for Logic World in March 2005. Specifically, she stated that she "bill[ed] medical services rendered by [the] company." Despite this statement, she later told investigators that she began billing for Logic World only in September 2005.

Rose received regular payments from Logic World's account. In July 2003, Benjamin wrote Rose a $1,000 check, the memo line of which indicated it was for office supplies. In December 2004, Benjamin paid Rose $2,000 for "payroll." Benjamin stated he tried to pay her about $2,000 a month. In total, Rose received over $23,000 from Logic World's accounts.

Eventually, Logic World was billing Medicaid for providing diapers to around 200 people, bringing in $20,000 in monthly profit from the billings. After receiving complaints from Medicaid beneficiaries, the Texas Health and Human Services Commission opened an investigation into Logic World. Investigator Betty Sam ("Sam") noticed that Logic World was consistently billing Medicaid for 300 diapers per person, per month—the maximum quantity of diapers for which Medicaid will pay. According to Sam, a person using 300 diapers per month would likely "need to be in a hospital, because the urinary incontinence

would really be severe." Sam also noted that Logic World was billing Medicaid for extra-large adult diapers for a five- or six-year-old child.

Sam decided to go to the Logic World office to request their records. She arrived during posted business hours, but after finding the office closed, decided to go to Benjamin's house. Benjamin told her that the business records would be available by the end of the day, but when Sam returned to the Logic World office, she found Rose and other employees "trying to put records together." Although Benjamin delegated the duty to validate the records to Rose, Logic World never produced all the requested evidence. For example, none of the receipts Logic World provided from its various suppliers indicated any purchases of extra-large adult diapers.

As part of Sam's investigation, Rose provided a voluntary statement: "I print out invoices for [Logic World,] receive faxes from doctors' offices or patients on patient supplies. Order supplies for the company. Return phone calls. I started billing for the company in [September] 2005 . . . . Request . . . [from] the doctor's office, I call the delivery guy to pick up a new invoice on a patient. I bill for it. . . . Then the Medicaid pays the company for it." Akpan, the delivery driver, told Sam: "Benjamin and Rose makes the call for me to pick the slips up and after that, I pick the supplies from the storage and deliver them and then return the slips to the office, to Benjamin and Rose."

For each Medicaid beneficiary receiving supplies, a provider should have on file a completed Title 19 form and a signed slip demonstrating that the supplies were in fact delivered. Sam determined that Logic World's Title 19 forms were deficient. The delivery slips that Logic World provided were missing the date of delivery and the name of a delivery person with whom Sam could verify the delivery. At least one doctor whose signature appeared on a Logic World Title 19 form told Sam that he did not approve the supplies.

No. 12-20094

Sam ultimately determined that all of Logic World's claims were invalid. Based on this determination, the Texas Health and Human Services Commission sought to recoup $1,109,123.10 from Logic World and to exclude Benjamin from Texas Medicaid.

### 2. The Second Company: General Medtronics

After the Logic World investigation, the Essien family began operating a new company called General Medtronics. Rose was put "in charge of it," and signed letters as its president. In March 2007, Rose submitted an application for a Medicare license for General Medtronics, on which she listed herself as General Medtronics' owner. As part of the application, Rose attached service agreements she had signed with two DME suppliers.

After she secured the Medicare license, Rose applied for a Medicaid license. Benjamin assisted with her application because he "had no payment coming in" and "wanted to have her probably continue [to sell] my diapers." Rose signed the Medicaid application in April 2007, certifying that she was willing to follow Medicaid requirements. While Medicaid was verifying General Medtronics' application, Medicare revoked General Medtronics' status after it was unable to verify Medtronics' supplier standards because no one knowledgeable about the company was present at any of four attempted site visits. The Medicaid application was also denied.

### 3. The Third Company: Roben Medical

After General Medtronics' licenses were denied by Medicaid and revoked by Medicare, the Essien family established a third company, Roben Medical ("Roben"). Benjamin helped Bassey set up the company. Roben was ultimately approved for Medicare and Medicaid licenses.

An analyst in Sam's office decided that Roben Medical warranted a closer investigation after noticing excessive billing patterns. Sam reviewed Roben's claim records in early 2009, finding "the same consistent billing patterns of the

300 maximum [diaper] quantity." Roben had billed Medicaid $236,896.10, more than half of which was for extra-large diapers for ninety Medicaid beneficiaries. Sam noticed that Roben was billing for the same list of beneficiaries that Logic World had been.

Sam tried unsuccessfully to visit Roben's office, finding it closed during its normal business hours. Sam later located Bassey, who was unable to produce the records Sam requested. Bassey told Sam: "I buy my supplies from Sam's Club. . . . My billing is done by Imeh Akpan, except for the last month. Rose Essien billed for Roben the last month. Ms. Rose Essien does not charge me to bill. I am arranging to get another biller." Roben's bank records show that two checks were written from the company to Rose, totaling $9,220.

Sam then interviewed Medicaid beneficiaries who were listed as having received diapers from Roben. For one beneficiary, Roben had billed Medicaid for extra-large adult diapers, but the delivery slips noted that the diapers were actually child-sized. One of Roben's delivery slips said "General Medtronics" on it, even though General Medtronics was never a licenced provider. Sam noticed that some of Roben's Title 19 forms had "Logic World" whited out and replaced by "Roben." A Title 19 form is valid for six months, but at least one whited-out form dated 2004 was being used for a 2008 billing. Sam noted that Rose Essien signed multiple forms on behalf of Roben, including one of the whited-out forms.

As with Logic World, Sam determined that all of Roben's claims were invalid and recommended that the state seek to recoup all amounts paid. The Texas Health and Human Services Commission ordered the recoupment of $236,896.10 and assessed additional civil penalties.

*4. Indictment and Trial*

On April 30, 2009, a grand jury in the Southern District of Texas indicted Benjamin and Rose Essien on one count of conspiracy to commit health care fraud, eight counts of health care fraud, and two counts of aggravated identity

theft. On February 25, 2010, Benjamin pleaded guilty, but the details of the plea agreement are outside this record. After his plea, the grand jury returned a superseding indictment. The indictment added Bassey Essien and Ebong Akpan (a delivery driver) as defendants and added additional counts of health care fraud and aggravated identity theft against the group. Ultimately, the grand jury indicted the group, including Rose, with one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, thirteen counts of health care fraud, in violation of 18 U.S.C. § 1347, and five counts of aggravated identify theft, in violation of 18 U.S.C. § 1028A.

A jury trial began on March 29, 2011, against Rose, Bassey, and Ebong Akpan. Sam testified about her investigation, described above, and Sergeant Gordon Lunsford of the Texas Attorney General's Medicaid Fraud Unit described the investigation his office conducted. Specifically, he identified records indicating that either Logic World or Roben had billed Medicaid for 300 diapers for an individual—the maximum permissible per person. He also demonstrated for the jury that many of the Title 19 forms related to the Logic World charges bore the same photocopied physician's signature.

Lunsford said that Logic World had purchased only 7,300 diapers, but had billed Medicaid for 960,459 diapers, costing $1,187,994.58. Roben had purchased only 69,148 diapers, but billed Medicaid for 266,400 diapers at a cost of $320,706.14. Rose Essien received compensation of $37,609 from the companies. Mary Ann Wallace from the Texas Medicaid Partnership testified. She identified forty-nine calls that Rose made to Medicaid on behalf of Logic World, the content of which illustrated Rose's significant administrative role in the company. For example, on February 2, 2005, Rose called Medicaid concerning the computer software that Logic World used to submit claims to Medicaid, indicating to Wallace that Rose was in the process of enabling Logic World to process claims to Medicaid. Another time, Rose called Medicaid for

"TDH Connect training." The notes from the call made it sound "like the agent handling the call was advising [Rose,] here is some information you need to gather and when you get ready for your processing or your training, you're going to need to have your user name and password ready." In June 2005, Rose called concerning a "portal account issue," and notes from that call indicate that Rose was "trying to log in as an administrator" on the account. On another occasion, Rose, needing to install a new version of the software, called Medicaid because to do so you "have to know what information is required to process a claim to put into the software so that you can file a claim." Another time, Rose called Medicaid seeking to put a restriction on Logic World's provider number "so that no one can call to get the [reimbursement] check amounts."

For each health care count charged in the indictment, at least one witness testified that the beneficiary did not receive the diapers that Logic World or Roben claimed to have delivered. As to the aggravated identity theft counts, beneficiaries testified that they never authorized the defendants to use their personal identifiers to bill Medicaid.

Dr. Ramachandra Mayla, a physician whose signature appears on many of the Title 19 forms used, testified that although he occasionally prescribed diapers, very few times in his career had he prescribed 300 diapers a month. Further, Dr. Mayla reviewed the Title 19 forms from Logic World that bore his signature. Among them, he found one containing a prescription for a woman he believed to be deceased as of the date of the prescription. Dr. Mayla said that someone had forged his signature, as he would never sign a blank Title 19 form and would not have prescribed for someone who was not presently his patient.

Benjamin Essien, after pleading guilty in his own case, testified in Rose's defense. Benjamin claimed that once Howard stopped billing for him, he realized she had been billing incorrectly. Benjamin testified that he did not correct Howard's errors and did not process refunds as he should have. He

No. 12-20094

acknowledged that doing so violated the law. Benjamin stated that Rose would provide him with patient updates, but that he chose to ignore them. Benjamin testified that Rose never billed Medicaid directly. Instead, she prepared the information for him, and he submitted it to Medicaid. He also stated that her phone calls to Medicaid were done at his direction. Rose, according to Benjamin, was never told what he was "doing with the billing."

Benjamin testified that he tried to pay his sister $2,000 a month. Also, he wrote some checks to Rose, which she was supposed to use to pay his rent after his landlord refused to take his checks. When Benjamin and his wife missed their flight to Nigeria, Benjamin wrote a $9,000 check from Roben's account to Rose, which she was supposed to use to buy the couple another set of airline tickets. According to Benjamin, Rose did not have "anything to do with the operation of" Roben Medical.

Following the eight-day trial, Rose was convicted of eleven counts of health care fraud and five counts of aggravated identity theft. She was acquitted of conspiracy and two counts of health care fraud. The judge sentenced her to sixty months' incarceration, to be followed by a two-year term of supervised release. The court also ordered that Rose, jointly and severally with Benjamin and Bassey, pay the United States restitution in the amount of $1,455,837.91. Bassey was convicted on all counts while Akpan was acquitted on all.

## II.  JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. After judgment was entered, Rose Essien timely appealed. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## III.  DISCUSSION

### A. Insufficiency of the Evidence

First, Rose contends that there was insufficient evidence to convict her. The gravamen of her claim is that, because there is insufficient evidence that she

10

personally submitted the fraudulent bills, there is necessarily insufficient evidence to sustain a conviction. However, there is evidence that she was a "biller" earlier than she claimed at trial, and even aside from that, there is sufficient evidence to sustain her convictions.

### 1. Standard of review

In reviewing a challenge to the sufficiency of the evidence, this Court affirms where "a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt" when the evidence is "reviewed in the light most favorable to the government, drawing all reasonable inferences in support of the verdict." *United States v. Pennington*, 20 F.3d 593, 597 (5th Cir. 1994).

### 2. Counts 2–9 (Logic World Medicaid Fraud)

A defendant commits healthcare fraud when he knowingly and willfully executes, or attempts to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services. 18 U.S.C. § 1347(a); *see also United States v. Hickman*, 331 F.3d 439, 445 (5th Cir. 2003). As discussed below, there is sufficient evidence to support her conviction. In the alternative, her conviction can be affirmed if there was sufficient evidence that she aided or abetted the undisputed fraud.

Rose's main point of argument is that there is "no suggestion that [she] was involved at any stage of the billing process" until after fraudulent billing had ceased, in October 2005. Rose concedes that she made some calls before October 2005, but insists that it is "pure speculation" to infer that she was billing or involved in preparing falsified billing documents. She also notes that the dates of the fraudulent Logic World charges range from December 1, 2004

to August 4, 2005—all of which fall within the period during which Howard was responsible for billing for Logic World. Rose's final piece of evidence is that when Sam first interviewed Benjamin, he told her that Rose began billing in September 2005.

Rose's argument fails for at least two reasons. Mainly, the act of billing is not an element of Medicaid fraud. Rose does not contest that Logic World fraudulently billed Medicaid. The Government can use circumstantial evidence to prove that a defendant's knowing involvement in a scheme to defraud Medicaid. *See United States v. Ismoila*, 100 F.3d 380, 387 (5th Cir. 1996) (citing *United States v. Keller*, 14 F.3d 1051, 1056 (5th Cir. 1994) (stating that intent can be inferred from facts and circumstances)). Reviewing all the evidence in the light most favorable to the Government, there was sufficient evidence to support a verdict that Rose committed eight counts of Medicaid fraud through Logic World.

Rose began working for Logic World in 2004, which was before the date of the first charged fraud, July 21, 2005. According to Benjamin, Rose was extensively involved in the company. She maintained the office, updated patient records, and printed and accepted delivery tickets that purported to prove that a delivery had been made. She was supposed to adjust the "patient roster and take people off that shouldn't be there or add . . . the new name if somebody was found."

Rose began calling Medicaid on Logic World's behalf on October 26, 2004. At least some calls concerned the software Logic World used to bill Medicaid. Although Benjamin testified that such calls were made at his direction, implying that she was unaware of the scheme, when viewing the evidence in the light most favorable to the verdict, a reasonable juror could conclude that Rose had a role in the submission of fraudulent claims as early as 2004. The jury could reasonably have disbelieved Benjamin, who had already pleaded guilty to certain

charges against him. Further, regardless whether she made the calls at his direction, the calls indicate a high level of knowing involvement in the company, and therefore in the scheme. A reasonable juror could conclude that the office administrator, the person who maintained the office of a company billing Medicaid for ordering and delivering 960,459 diapers, would be a knowing participant when the company only purchased a total of 7,300 diapers.

Even if Rose were correct that billing was a required element for Medicaid fraud, taking all evidence in favor of the Government, there was evidence that Rose was a biller as of March 2005. Indeed, Rose listed on her application to pharmacy school that she was a "biller" for Logic World beginning March 2005.

*3. Counts 11–13 (Roben Medical Medicaid Fraud)*

Rose's position as to Counts 11–13, which relate to Medicaid fraud through Roben, is that the Government's exhibits do not demonstrate that she was involved in the transactions giving rise to Count 11, effectively conceding Counts 12 and 13. The fraudulent conduct giving rise to Count 11, 12, and 13 occurred on February 6, 2009, March 6, 2009, and March 6, 2009, respectively. She states that the February 6 delivery ticket seems to have been personally delivered by Bassey, that the bank account lists only Bassey and Benjamin, and that there is no evidence that she was involved with Roben at the time. Rose concedes that Sam testified that Bassey, when interviewed on March 16, 2009, stated that Rose had billed for him "the last month." Rose contends that it is not clear from Bassey's statement whether he meant February 2009 or the thirty-day period immediately preceding the interview.[3] Nonetheless, Rose seems to contend that

---

[3] If Rose were correct that billing was a required element of fraud, there would perhaps be an argument to be made—although Rose does not make it—that a reasonable jury could not find her guilty of both Counts 11 as well as Counts 12 and 13. The reasoning would be that Bassey's statement that "Rose Essien billed for Roben the last month" would either have to mean the month of February, or the thirty days immediately preceding, but could not mean both. The jury's verdict could nonetheless be upheld. The jury could have taken Bassey's statement colloquially to mean that she billed for approximately the last month. To

there is insufficient evidence only as to Count 11, effectively conceding Counts 12 and 13.

As discussed above, the evidence need not establish that Rose herself "billed" Medicaid on behalf of Roben to prove her knowing involvement in the scheme, as required for conviction. Just as with Logic World, Rose was receiving checks from Roben. The circumstances surrounding the creation of the three companies also support the jury's verdict. Rose had been involved in Logic World, which had been investigated before losing its Medicaid licensing in 2006. Then, Rose tried to obtain a Medicaid provider number for her own new company, General Medtronics. After being turned down, her father established Roben. Her willingness to work for, much less bill for, Roben, despite her knowledge about the fraud perpetrated by Logic World, could indicate to a reasonable juror that her involvement was knowing.

*4. Counts 15–19 (Aggravated Identity Theft)*

Aggravated identify theft, 18 U.S.C. § 1028A, occurs when the defendant (1) knowingly used (2) the "means of identification" of another person (3) without lawful authority (4) during and in relation to a violation of wire fraud. *United States v. Stephens*, 571 F.3d 401, 404–05 (5th Cir. 2009). Also, the defendant must know "that the means of identification at issue belonged to another person." *Flores–Figueroa v. United States*, 556 U.S. 646, 657 (2009).

Counts 15–17 allege that Ebong Akpan and Rose aided and abetted one another by unlawfully possessing and using the names and beneficiary numbers of specific beneficiaries to commit health care fraud for Logic World on August 4, 2005 (Counts 15 and 16) and June 26, 2006 (Count 17). For Counts 15 and 16, as above, Rose points out that Howard was Logic World's biller at that time.

---

encompass both sets of counts she would need to have billed from February 6 to March 6, a one month period. Bassey made the statement a mere ten days after the latter date.

Rose contends that because she was not the official biller for Logic World, "there is simply no evidence that Rose Essien committed these acts." Although billing is not a requirement for conviction, ironically, billing activity would likely be evidence of knowingly involvement in the scheme sufficient to support a verdict. As discussed above, Rose represented on her application to pharmacy school that she was a biller for Logic World as of March 2005, before the date of either count. That admission, along with the evidence discussed above, would support a reasonable juror's guilty verdict.

As to Count 17, committed June 26, 2006, Rose told Sam that she started billing for Logic World in September 2005. Thus, both her pharmacy school application and her statement to Sam support a reasonable juror's finding that, as a biller, Rose submitted the billing claim bearing the false identification.

Rose also argues that there is insufficient evidence to support a conviction on Counts 18 and 19. Those two counts concern billings made on behalf of Roben Medical on March 6, 2008, the same billings at issue in Counts 12 and 13.[4] Her argument again rests on her assertion that she did not bill or facilitate others in doing so. The false claims were submitted ten days before Bassey told Sam that "Rose Essien billed for Roben the last month." A reasonable juror could thus have concluded that Rose submitted the fraudulent bills using the identifications of Medicaid beneficiaries without authorization.

While the Government must prove that the defendant knew that the means of identification belonged to a real person, rather than a fictitious creation, the district court gave that instruction to the jury. The purpose of submitting forms bearing the names of the beneficiaries is to obtain payment from Medicaid. For Medicaid to reimburse a supplier, the beneficiaries listed would need to be actual Medicaid recipients. It would be fruitless to submit a

---

[4] As discussed above, Rose's brief seems to concede Counts 12 and 13.

bill for a non-existent person, much less a person who is not Medicaid-eligible. The jury could reasonably have concluded that Rose, knowing the purpose of the fraudulent scheme, also knew that the means of identification they used belonged to other people. As to each count of conviction, a reasonable jury could find that the evidence establishes guilt beyond a reasonable doubt.

## B. Plain Error in Restitution

Rose also contests the district's restitution order. She argues that because she was acquitted of conspiracy and two substantive counts of Medicaid fraud, she should not be responsible for the full amount of restitution sought. The presentence report calculated the amount of restitution at $1,455,837.91 by adding Medicaid's payments to Logic World ($1,101.865.37) and to Roben ($353,972.54). The district court ordered that Rose, jointly and severally with Benjamin and Bassey, repay the combined amount. Because Rose did not object to the order at trial, review is for plain error. Even if we assume *arguendo* that the restitution amount was in error, any error was far from plain. Thus, we affirm the restitution award.

### 1. Standard of Review

Where a defendant does not challenge a restitution order in the district court, this court reviews for plain error. *United States v. Inman*, 411 F.3d 591, 595 (5th Cir. 2005). Under plain error review, an appellant must show that (1) there was an error, (2) the error was plain, and (3) the error affected his substantial rights. *Id.* When all three requirements are met, the Court exercises its discretion to correct the error only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). Both parties here agree that plain error review applies.

Because our holding rests on the second prong of plain error analysis, we need only expand on that prong. A defendant seeking reversal under plain error

review must first establish that there is, in fact, an error—an unwaived deviation from a legal rule. *United States v. Olano*, 507 U.S. 725, 732–33 (1993). Second, not only must there be error, but the error must be "plain." "'Plain' is synonymous with 'clear' or, equivalently, 'obvious.'" *Id*. at 734; *see also United States v. Frady*, 456 U.S. 152, 163 (1982) (stating that error must be so plain that the trial judge was derelict in countenancing it).

### 2. Discussion

The law on the scope of restitution for fraudulent schemes is not entirely settled. There is some case law indicating that restitution orders for guilty pleas differ from those for jury verdicts. *See United States v. Adams*, 363 F.3d 363, 367 (5th Cir. 2004). *Adams* involved determining the scope of restitution where the defendant had pleaded guilty. The *Adams* court observed that where a jury verdict is available, the indictment largely determines the scope of the underlying scheme to defraud, citing three cases in support. *Id*. at 366. But the court also stated, without citation, that the jury verdict defines the scope of the fraudulent scheme. *Id*. at 367. *Adams* does not provide clear guidance on the scope of restitution with a jury verdict, likely because the issue was not before it. Because the defendant accepted a plea, the court did not have occasion to fully evaluate the correct scope of restitution for a jury verdict—making its comments on the topic dicta. *Id*. at 364.

A later Fifth Circuit case more clearly supports the restitution award in this case. *United States v. Maturin*, 488 F.3d 657, 661–62 (5th Cir. 2007). *Maturin*, although dealing with a guilty plea, noted that 18 U.S.C. § 3663A provides that when a defendant has been convicted of "any offense committed by fraud or deceit" the defendant shall "make restitution to the victim of the offense." *Id*. at 660 (citing 18 U.S.C. § 3663A). Restitution shall be awarded to "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A. "[A] defendant's

17

conviction on one count can support a broad restitution award encompassing additional losses *only* if the count of conviction requires proof of a scheme, conspiracy, or pattern of criminal activity as an element." *Maturin*, 488 F.3d at 661–62.

The district court here awarded restitution pursuant to 18 U.S.C. § 3663A, as did the district court in *Maturin*. An element of an offense of which Rose was convicted is "knowingly and willfully execut[ing] . . . a scheme or artifice . . . to defraud any health care benefit program." 18 U.S.C. § 1347. Because a count of her conviction, health care fraud, requires proof of a scheme as an element, her conviction can support a broad restitution award encompassing the additional losses that were apart of the scheme as indicted. Thus, the district court likely did not err, and if it did, any error was certainly not "clear" or "obvious." Because the district court did not plainly err, we affirm its restitution order.

## IV. CONCLUSION

For the foregoing reasons, the convictions and restitution order are AFFIRMED.