**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 14-20399

United States Court of Appeals
Fifth Circuit

**FILED**
August 6, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

VALNITA TURNER, R.N.,

Defendant - Appellant

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:12-CR-244-3

Before JOLLY, HIGGINBOTHAM, and DAVIS, Circuit Judges.

PER CURIAM:*

Valnita Turner, a registered nurse, was convicted by a jury on four counts of healthcare fraud in violation of 18 U.S.C. § 1347 and one count of conspiracy to commit healthcare fraud in violation of 18 U.S.C. § 1349. The jury found that Turner engaged in a multifaceted scheme to fraudulently obtain Medicare reimbursements. In carrying out the scheme, Turner purchased stolen, confidential health information about Medicare

---

* Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 14-20399

beneficiaries, and used it to recruit patients for the home-health agencies with which she was affiliated. She also submitted, on behalf of those agencies, claims to Medicare seeking reimbursement for home-health services not authorized by a doctor who had seen or treated the patient. As a result of the scheme, the agencies received more than $3 million in reimbursements that Medicare otherwise would not have paid.

On appeal, Turner challenges one count of her healthcare-fraud conviction, one of the district court's jury instructions, and several of the district court's sentencing determinations. For the reasons stated below, we AFFIRM.

I.

Turner owned Houston Compassionate Care, Inc., a home-health agency, and was the director of nursing at Prestige Health Services, Inc., another home-health agency. She also owned Texas Comprehensive Healthcare Resources, Inc., a marketing company. Both Houston Compassionate and Prestige were enrolled Medicare providers, meaning that they were authorized to claim reimbursement from Medicare for services provided to Medicare beneficiaries.

Medicare reimburses the costs of home-health services provided to beneficiaries who are, because of illness or disability, "homebound," but only under certain circumstances. *See, e.g., United States v. Njoku*, 737 F.3d 55, 61 (5th Cir. 2013). As relevant here, Medicare reimburses the costs of home-health services only if the services are ordered by a doctor who has examined the beneficiary. Typically, home-health agencies memorialize a referring doctor's orders using a standardized form called a "CMS-485." If the doctor initially gives orders verbally, a registered nurse must, in Box 23 of a CMS-485, verify them with her signature. Box 24 of a CMS-485 asks for the name and address of the referring doctor, and Box 27 requires that doctor's

2

signature. According to the trial testimony of the government's Medicare expert, Medicare does not pay claims when the doctor who signs in Box 27 of a CMS-485 is not the same as the doctor listed in Box 24 (i.e., when the CMS-485 has an "invalid countersignature"). Additionally, the expert testified, Medicare does not pay claims associated with services provided to beneficiaries who were obtained as patients through the provider's use of kickbacks or bribes.

In 2008, Turner, along with her brother Valdie Jackson, initiated a plan to generate business for Houston Compassionate by purchasing the stolen health information of Medicare beneficiaries from a friend of Jackson's named Jarvis Thomas. Thomas worked for a local hospital, the Harris County Hospital District (the Hospital), and therefore had access to the confidential health information of a large number of Medicare beneficiaries. According to the plan, Turner would provide money to Jackson, who in turn would pay Thomas every few weeks in exchange for the health information of a new set of beneficiaries. Turner would then use the information (through her marketing company Texas Comprehensive) to solicit the beneficiaries to become patients of Houston Compassionate.

In addition to recruiting patients using stolen health information, Turner and others at the home-health agencies with which she was affiliated engaged in a practice of submitting reimbursement claims to Medicare for services that had not been ordered by a referring doctor. In doing so, Turner (or another nurse at the agency) would sign in Box 23 of a CMS-485, falsely stating that she had received verbal orders from a patient's referring doctor to begin home-health services. She would then fill in Box 24 with the name and

No. 14-20399

NPI number[1] of a doctor, but have a different doctor—specifically, the on-staff medical director of either Houston Compassionate or Prestige—sign in Box 27.[2] (Typically, she would first send the CMS-485 to the doctor whose name she had used in Box 24, but if the doctor ignored it or declined to sign—as, unsurprisingly, would often happen—she would then have the form taken to one of the medical directors for his signature.)

Turner took steps to shield these activities from detection. For instance, Turner directed Jackson to open his own home-health agency—Jackson Home Health—in order to spread out the patient population from Houston Compassionate and therefore avoid raising any "red flag[s]." For a similar reason, Turner would distribute the patients recruited using the stolen health information among Houston Compassionate, Prestige, and Jackson Home Health. Finally, although she initially provided Jackson with money to pay Thomas in the form of cash or checks made out to Jackson, she eventually began making out checks to Doctors Choice Medical Billing, another of Jackson's companies. She directed Jackson to generate false invoices from Doctors Choice to make these payments appear legitimate.

Despite these measures, Turner's activities were eventually detected, and she and several coconspirators were indicted on charges of healthcare fraud under 18 U.S.C. § 1347 and related charges. Under this court's precedent, "each execution" of a particular healthcare-fraud scheme "may be charged as a separate count." *United States v. Hickman*, 331 F.3d 439, 446

---

[1] A doctor's NPI, or National Provider Indicator, number is, according to the government's Medicare expert, a "unique identifier" for each healthcare provider—"like a social security number for a physician."

[2] Houston Compassionate's medical director was Dr. Ben Echols. Echols's actions in signing CMS-485s for patients he had not seen resulted in his being convicted of, among other things, conspiracy to commit healthcare fraud. *See generally United States v. Echols*, 574 F.App'x 350 (5th Cir. 2014) (affirming Echols's convictions).

No. 14-20399

(5th Cir. 2003). Accordingly, Counts 5–8 of the indictment charged Turner with healthcare fraud based on claims submitted by the home-health agencies with respect to four particular Medicare beneficiaries (beneficiaries B.J., M.D., J.C., and P.O.).

The jury found Turner guilty on all four counts of healthcare fraud and on a count of conspiracy to commit healthcare fraud. The district court sentenced Turner to 151 months of imprisonment, and held her jointly and severally liable with the others charged in the indictment for a restitution award of $3,011,899.09.

## II.

Turner raises several issues on appeal, which are subject to varying standards of review.

First, Turner argues that the evidence was insufficient for the jury to convict her on Count 8 of the indictment. Because she failed to raise this argument in a motion for acquittal "at the close of all evidence," our review is for plain error only. *United States v. Daniel*, 957 F.2d 162, 164 (5th Cir. 1992). In the sufficiency-of-the-evidence context, plain-error review means that Turner's challenge will succeed only if "the record is *devoid of evidence* pointing to guilt or if the evidence is so tenuous that a conviction is shocking." *United States v. Delgado*, 672 F.3d 320, 330–31 (5th Cir. 2012) (en banc) (internal quotation marks omitted).

Next, Turner challenges one of the district court's jury instructions. Turner did not object to the instruction at trial, so our review is for plain error. *See, e.g., United States v. Daniels*, 252 F.3d 411, 414 (5th Cir. 2001). "A jury charge is plain error if: (1) it was erroneous; (2) the error was plain; and (3) the plain error affected the substantial rights of the defendant." *Id.* If these conditions are met, "we have discretion to correct the error; discretion we will exercise if the error 'seriously affects the fairness, integrity or public reputation

No. 14-20399

of judicial proceedings.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

Turner's remaining challenges are to her sentence. "We review the district court's legal interpretation and application of the sentencing guidelines de novo and its factual findings for clear error." *United States v. Pillaut*, 783 F.3d 282, 286 (5th Cir. 2015) (internal quotation marks omitted). "The district court's factual finding is not clearly erroneous if it is plausible in light of the record read as a whole." *Id.* at 287 (internal quotation marks omitted).

## III.

As noted, Turner challenges one count of her healthcare-fraud conviction, one of the district court's jury instructions, and several of the district court's sentencing determinations. We consider each challenge in turn.

## A.

Turner first argues that the evidence presented at trial was insufficient to support her conviction on Count 8 of the indictment.

Counts 5–8 of the indictment charged Turner with healthcare fraud in violation of 18 U.S.C. § 1347. Section 1347 provides:

> (a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—
>> (1) to defraud any health care benefit program; or
>> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>> in connection with the delivery of or payment for health care benefits, items, or services, shall be [punished].

As its text makes clear, § 1347 "punishes executions or attempted executions of schemes to defraud, . . . not simply acts in furtherance of the scheme." *Hickman*, 331 F.3d at 446.

6

No. 14-20399

The district court also instructed the jury that it could convict Turner on Counts 5–8 if she aided and abetted another's violation of § 1347.[3]  "A defendant may be convicted of aiding and abetting a substantive criminal offense when he associates with the criminal activity, participates in it, and acts to help it succeed." *United States v. Delagarza-Villarreal*, 141 F.3d 133, 140 (5th Cir. 1998) (internal quotation marks omitted).

Turner's sufficiency challenge focuses on only one of her healthcare-fraud convictions—the conviction on Count 8 of the indictment, which charged her with healthcare fraud based on claims submitted by Prestige with respect to Medicare beneficiary P.O.  Turner's challenge hinges on the difference between the government's evidence supporting Count 8 and its evidence supporting the other counts of conviction.  As for Counts 5, 6, and 7—which charged Turner with healthcare fraud based on claims submitted with respect to Medicare beneficiaries B.J., M.D., and J.C., respectively—the government's evidence showed that these beneficiaries' doctors had not ordered home-health services, and that Turner herself had signed in Box 23 of the fraudulent CMS-485s relating to these beneficiaries.  As for Count 8, however, the government presented no direct evidence that home-health services were not ordered by a referring doctor, and Box 23 of the relevant CMS-485 was signed not by Turner, but by another Prestige nurse.  Thus, although the reimbursement claims that formed the basis of Count 8 are indisputably fraudulent insofar as they are based on a CMS-485 signed by a doctor other than the one listed as the referring doctor, Turner argues, essentially, that the government failed to prove that this fraud is attributable to *her*.

---

[3] Turner challenges this instruction on appeal, but, as discussed *infra* pp. 9–11, her challenge is meritless.

No. 14-20399

"A defendant need not have actually submitted the fraudulent documentation to [Medicare]," however, "in order to be guilty of health care fraud." *United States v. Imo*, 739 F.3d 226, 235 (5th Cir. 2014).  And in any event, there is sufficient evidence in the record from which the jury could conclude that Turner at least aided and abetted Prestige's submission of fraudulent reimbursement claims related to P.O.  As an initial matter, it is undisputed that Prestige is one of the entities that Turner used to further the overall scheme: Prestige was located in the same building as the other three entities involved in the scheme (Houston Compassionate, Texas Comprehensive, and Jackson Home Health); Turner was director of nursing at Prestige and distributed to it the business of some of her illegally recruited patients; and, in presenting evidence as to Count 7 of the indictment—a conviction that Turner has not appealed—the government showed that Turner personally signed off on Medicare beneficiary J.C.'s fraudulent CMS-485 in her capacity as director of nursing at Prestige.

Furthermore, the jury could specifically have linked Turner to Prestige's fraudulent submission of claims related to P.O.  This is so because the jury could have concluded that P.O. was one of the patients whose health information Turner bought from Thomas, and thus who became a patient of Prestige only as a result of Turner's illegal recruitment.  First, P.O.'s name appears on the Hospital's list of approximately 2,400 patients whose health information Thomas accessed while a Hospital employee.  Second, Thomas testified that he sold the health information of "2,000 or more" patients to Turner—a number at least near the total number of patients whose health information Thomas accessed.  Finally, the CMS-485 and other documents relating to services provided to P.O. featured invalid physician countersignatures, giving rise to a reasonable inference—and thus an inference that, in reviewing the jury's verdict, we must draw, *see, e.g., United*

8

No. 14-20399

*States v. Beacham*, 774 F.3d 267, 272 (5th Cir. 2014)—that P.O. was not legitimately referred to Prestige, but instead became a patient only after Turner recruited her using the stolen health information.  Concededly, this is not *overwhelming* evidence that Turner illegally recruited P.O. to Prestige, thus aiding and abetting Prestige's later submission of fraudulent, P.O.-related claims to Medicare.  But it is certainly *some* evidence, and, since Turner failed to preserve her sufficiency argument in the district court, *see supra* p. 5, it is more than enough to sustain her conviction.  *See, e.g., Delgado*, 672 F.3d at 331 ("[U]npreserved insufficiency claims . . . will be rejected unless the record is *devoid of evidence* pointing to guilt or if the evidence is so tenuous that a conviction is shocking." (internal quotation marks omitted)).

In sum, because the record is not "devoid of evidence" suggesting that P.O. was one of the patients whom Turner illegally recruited to a home-health agency using stolen health information, *Delgado*, 672 F.3d at 331 (emphasis omitted), the jury could permissibly have concluded that Turner at least aided and abetted in the agency's submission of fraudulent reimbursement claims for services provided to P.O.  We therefore reject Turner's challenge to her conviction on Count 8 of the indictment.

B.

Next, Turner argues that the district court constructively amended the indictment by instructing the jury that she could be convicted of aiding and abetting executions of the healthcare-fraud scheme.

The Fifth Amendment's Grand Jury Clause "guarantees that a criminal defendant will be tried only on charges alleged in a grand jury indictment." *United States v. Threadgill*, 172 F.3d 357, 370 (5th Cir. 1999).  A jury instruction violates this guarantee if it "constructively amends an indictment"—that is, if it permits the jury "to convict on an alternative basis .

9

No. 14-20399

. . not charged in the indictment." *Daniels*, 252 F.3d at 413–14 (internal quotation marks omitted).

The district court instructed the jury that it could find Turner guilty on an aiding-and-abetting theory.  Turner now argues that, in doing so, the district court constructively amended the indictment—an indictment that, Turner says, charged her with substantive counts of healthcare fraud and with conspiracy to commit healthcare fraud, but not with aiding and abetting.  As noted *supra* pp. 5–6, Turner did not object to the jury instructions, so our review is for plain error.  Applying plain-error review, Turner's constructive-amendment argument fails on the first prong of plain error, for reasons both factual and legal.

Factually, the premise of Turner's argument—that, as she says, she "was not indicted, pursuant to 18 U.S.C. § 2, for . . . committing health care fraud by aiding and abetting"—is contradicted by the face of the indictment.  As the government points out, under the counts relevant here, the indictment alleges that Turner "submitted *and aided and abetted* the submission of false and fraudulent claims to Medicare" (emphasis added).  To be sure, the indictment does not specifically cite the aiding-and-abetting statute.  But to sufficiently charge an offense, an indictment need not specifically cite the relevant statute; instead, it must only "allege each essential element of the offense charged so as to enable the [defendant] to prepare his defense and to allow the [defendant] to invoke the double jeopardy clause in any subsequent proceeding."  *See Threadgill*, 172 F.3d at 373.  Because the indictment in fact charged Turner with aiding and abetting, the district court's aiding-and-abetting instruction did "not broaden the possible bases of conviction beyond what is embraced by the indictment," and therefore "did not constitute a constructive amendment." *United States v. McGilberry*, 480 F.3d 326, 332 (5th Cir. 2007) (emphasis and internal quotation marks omitted).

No. 14-20399

In any event, this court's precedent dictates that the district court's aiding-and-abetting instruction would have been permissible even *had* the indictment not mentioned aiding and abetting. "Aiding and abetting is not a separate offense, but it is an alternative charge in every indictment, whether explicit or implicit." *United States v. Neal*, 951 F.2d 630, 633 (5th Cir. 1992). Thus, the "general rule" is that "an aiding and abetting instruction may be given to the jury even though the indictment does not specifically mention aiding and abetting, so long as evidence is introduced to support an aiding and abetting conviction." *United States v. Botello*, 991 F.2d 189, 191–92 (5th Cir. 1993). Turner identifies no reason why this "general rule" should not govern here,[4] nor does she make any showing of "unfair surprise." *See United States v. Turner*, 674 F.3d 420, 442 (5th Cir. 2012) ("We will only reverse a decision to give an aiding and abetting instruction when there has been a showing of unfair surprise.").

In sum, the district did not err in giving the aiding-and-abetting instruction here.

## C.

The district court found that Turner's fraudulent scheme caused over $3 million in monetary loss to Medicare. Using that figure, the district court applied an 18-level enhancement to Turner's offense level under U.S.S.G.

---

[4] In *United States v. Lopez*, 392 F. App'x 245 (5th Cir. 2010), we recognized a situation in which the "general rule" may not apply. There, a defendant who was "indicted solely on principal liability under 8 U.S.C. § 1324" argued (for the first time on appeal) that the district court constructively amended his indictment by giving an aiding-and-abetting instruction. *Id.* at 249. Because § 1324 is a "unique" statute in that it "distinguishes for purposes of punishment between a principal and an aider and abetter," the *Lopez* court assumed, without deciding, that the district court's aiding-and-abetting instruction was error, and resolved the case on a different prong of plain-error review. *Id.* at 250–52. Turner cites *Lopez*, but it is inapposite: unlike § 1324, Turner's statute of conviction—§ 1347—draws no distinction between principals and aiders and abetters.

No. 14-20399

§ 2B1.1(b)(1)(J).  Turner now argues that the district court clearly erred in finding the amount of loss attributable to her fraudulent scheme.

"The amount of loss resulting from the fraud is a specific offense characteristic that increases the base offense level under the U.S. Sentencing Guidelines." *United States v. Isiwele*, 635 F.3d 196, 202 (5th Cir. 2011).  Loss is determined using "the greater of actual . . . or intended loss."  § 2B1.1 cmt. n.3(A).  Under the relevant-conduct guideline, the loss amount attributable to the defendant may include losses resulting from "all reasonably foreseeable acts and omissions of others in furtherance of . . . jointly undertaken criminal activity."  *Id.* § 1B1.3(a)(1)(B).  A "jointly undertaken criminal activity," in turn, is defined as "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others."  *Id.* § 1B1.3 cmt. n.2.

Applying § 1B1.3(a)(1)(B), the presentence report (PSR) calculated the actual loss attributable to Turner to be the total amount of the fraudulent claims paid by Medicare to all three home-health agencies involved in the scheme (i.e., Houston Compassionate, Jackson Home Health, and Prestige)—$3,011,899.09.  The PSR reached this figure by adding together the claims paid to each of the three agencies based on invalid physician countersignatures and on patients whose health information had been stolen by Thomas, then subtracting the amount of overlap between these two categories of claims.  The district court adopted the PSR's findings, and thus applied the 18-level enhancement to Turner's base-offense level.

On appeal, Turner argues that she should not be held accountable for the portion of the district court's loss amount attributable to fraudulent claims paid to Jackson Home Health.  She stresses that her ties to Jackson Home Health are weaker than her ties to the other two agencies: while she owned Houston Compassionate and provided nursing and administrative services at Prestige, her *brother*, Valdie Jackson, was the owner, registered agent, and

director of Jackson Home Health.  Furthermore, she says, while Jackson Home Health concededly engaged in fraudulent billing practices identical to hers, there is no evidence that she "jointly undert[ook] in the distinct business of Jackson Home Health."  Finally, citing this court's decision in *United States v. Ekanem*, she asserts that, even though she *knew* of Jackson Home Health's fraudulent practices, knowledge alone is an insufficient basis on which to attribute losses caused by Jackson Home Health to her under § 1B1.3(a)(1)(B). *See* 555 F.3d 172, 176 (5th Cir. 2009) ("Ekanem's mere awareness that Usanga was operating an identical fraudulent scheme is insufficient to hold Ekanem responsible for Usanga's actions.").

We find no clear error, however, in the district court's holding Turner responsible for losses caused by Jackson Home Health's fraudulent activities. *See, e.g., United States v. Wall*, 180 F.3d 641, 644 (5th Cir. 1999) ("A district court's determination of what constitutes relevant conduct for purposes of sentencing is reviewed for clear error.").  First, as for the losses caused by Jackson Home Health's billing Medicare based on stolen patient information, there is ample evidence that Turner jointly undertook that activity: she financed the procurement of the information from Thomas; directed Jackson to establish Jackson Home Health in order to spread out the patient population and thereby avoid government scrutiny; and distributed the patients recruited using the stolen patient information to the three home-health agencies involved in the scheme, including Jackson Home Health.  Similarly, there is evidence that Turner jointly undertook Jackson Home Health's billing Medicare based on improper CMS-485s: she personally signed off on some of the improper CMS-485s using her registered-nurse credentials; she received around $9,000 in compensation from Jackson Home Health; and, again, Jackson Home Health was established in the first place on her instructions.

No. 14-20399

Given this extensive evidence that Turner "jointly undert[ook]" the fraudulent activities of Jackson Home Health, we cannot say that the district court erred in including Jackson Home Health's fraudulent billing as part of Turner's relevant conduct for the purposes of § 2B1.1(b).[5]

### D.

Next, Turner challenges the district court's application of a four-level "organizer or leader" enhancement to her sentence under U.S.S.G. § 3B1.1(a).

Under the aggravating-role enhancement, § 3B1.1, sentencing courts apply a four-level enhancement to the defendant's offense level if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." *Id.* § 3B1.1(a). If, however, the defendant was only a "manager or supervisor" of such an activity, the court enhances the sentence by three levels. *Id.* § 3B1.1(b). "In distinguishing a leadership and organizational role from one of mere management or supervision, titles . . . are not controlling." *Id.* § 3B1.1 cmt. n.4. Instead, courts should consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the

---

[5] The district court used the same, $3,011,899.09 figure to determine the amount for which Turner was jointly and severally liable to Medicare in restitution under the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A. Turner has appealed the district court's restitution award, but her only argument for why the restitution award is excessive is the same as her argument for why the district court's loss-amount calculation under § 2B1.1(b) is excessive—that she should not be responsible for the fraudulent claims paid to Jackson Home Health. For the same reasons that Turner's argument is unpersuasive as to loss amount, then, it is unpersuasive as to the restitution award. *See, e.g., United States v. Maturin*, 488 F.3d 657, 660–61 (5th Cir. 2007) ("[T]his court has held that where a fraudulent scheme is an element of the conviction, the court may award restitution for actions pursuant to that scheme." (emphasis and internal quotation marks omitted)); *see also United States v. Essien*, 530 F. App'x 291, 302 (5th Cir. 2013) ("Because a count of [defendant's] conviction, health care fraud, requires proof of a scheme as an element, [the] conviction can support a broad restitution award encompassing the additional losses that were a part of the scheme as indicted.").

crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.* "[A] criminal activity can have more than one organizer or leader." *United States v. Rodriguez*, 897 F.2d 1324, 1327 (5th Cir. 1990); *see also* § 3B1.1 cmt. n. 4.

Turner argues that the district court clearly erred in finding that she was an organizer or leader. *See United States v. Alaniz*, 726 F.3d 586, 622 (5th Cir. 2013) ("The district court's determination that a defendant was a leader or organizer under subsection 3B1.1(a) is a factual finding that this court reviews for clear error." (internal quotation marks omitted)). Although she acknowledges that she was the owner of Houston Compassionate, she emphasizes that this title is not controlling. *See* § 3B1.1 cmt. n.4. Looking past her title to the substance of the operations at Houston Compassionate, she asserts that Forster Duru—nominally, her accountant—is more appropriately considered an organizer or leader. As she points out, Duru owned the building that housed all three home-health agencies involved in the scheme. Further, Duru generally "'ran' the financial side of the fraud," Turner says, while her role "was very compartmentalized to the clinical side." Thus, in Turner's view, while there may have been sufficient evidence to support a *three*-level enhancement for her being a manager or supervisor, the district court's application of the *four*-level, organizer-or-leader enhancement was error.

The government counters that the evidence demonstrates that Turner "played a lead role" in the fraud, given that she owned both Houston Compassionate and Texas Comprehensive and was the director of nursing and an assistant administrator at Prestige. The government also downplays Duru's role in the scheme. For one thing, the government asserts, even if Duru

controlled the businesses' finances, he was not in charge of illegally recruiting patients or securing improper doctor signatures on CMS-485s, and *those* are the activities that were at "the heart of the scheme." In any event, the government continues, a criminal activity may have more than one organizer or leader. *See* § 3B1.1 cmt. n.4. Finally, the government concludes, the record evidence suggests that three of the guideline factors—that the defendant "exercise[d] . . . decision making authority"; "plann[ed] or organiz[ed] the offense"; and "control[led]" the actions of others—provide particularly strong support for the district court's conclusion that Turner was an organizer or leader.

We think the government has the better of this argument. First, the record indeed indicates that Turner both exercised considerable decisionmaking authority and planned or organized the scheme: as noted, she authorized Jackson's paying Thomas for the stolen patient information, and she was responsible for distributing the illegally recruited patients among the three home-health agencies. The record further indicates that Turner exercised a significant degree of control over the actions of others involved in the scheme: for instance, she directed Jackson to open Jackson Home Health in order to conceal the offense, and she instructed her employees at Houston Compassionate to send CMS-485s to the on-staff medical director for his signature when the agency could not obtain the signature of the patient's real doctor. *See supra* p. 4.

Given this evidence, the district court's finding that Turner was an organizer or leader of the criminal activity was at least "plausible in light of the record read as a whole." *Alaniz*, 726 F.3d at 622 (internal quotation marks omitted).

No. 14-20399

E.

Finally, Turner argues that the district court clearly erred in finding that her offense "involved sophisticated means" in applying a two-level enhancement to her sentence under U.S.S.G. § 2B1.1(b)(10)(C).  In Turner's view, her offense did not involve sophisticated means because, "[s]imply put, the scheme involved using the names and [NPI] numbers of doctors without their consent so Medicare would pay," and there is "nothing complex or intricate about" that.

We find no clear error in the district court's finding that Turner's offense involved sophisticated means.  *See United States v. Valdez*, 726 F.3d 684, 695 (5th Cir. 2013) ("[T]his court reviews the factual finding that [a defendant] used sophisticated means for clear error.").  For the purposes of the guideline, "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." § 2B1.1 cmt. n.9(B).  The application notes to § 2B1.1 flesh out this definition with examples, including "hiding assets or transactions" and "the use of fictitious entities [or] corporate shells." § 2B1.1 cmt. n.9(B).  As the government points out, Turner's offense involved conduct directly analogous to these examples.  She "hid[]" her payments to Thomas by arranging them to go from her marketing company, Texas Comprehensive, to Jackson's billing company, Doctors Choice, while directing Jackson to generate false invoices to make the payments appear legitimate.  And she instructed Jackson to start his own home-health agency for the purpose of spreading out the illegally-recruited-patient population so as not to draw attention to the scheme.

Given the close analogy between Turner's conduct and conduct that, according to the application notes, exemplifies "sophisticated means," we conclude that the scheme for which the jury convicted Turner "falls squarely

17

No. 14-20399

within the sophisticated means enhancement." *United States v. Collins*, 774 F.3d 256, 266 (5th Cir. 2014).

## IV.

For these reasons, Turner's conviction and sentence are

AFFIRMED.